IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF CALIFORNIA
    1300 I Street
    Sacramento, CA 95814-2919

STATE OF COLORADO
    1300 Broadway, 10th Floor
    Denver, CO 80203

STATE OF CONNECTICUT
    55 Elm Street
    Hartford, CT 06141-0120

STATE OF DELAWARE
    820 N. French Street, 6th Floor
    Wilmington, DE 19801

STATE OF HAWAII
    425 Queen Street
    Honolulu, HI 96813

STATE OF ILLINOIS
    69 West Washington St., 18th Floor
    Chicago, IL 60602

STATE OF MAINE
    6 State House Station
    Augusta, ME 04333

STATE OF MARYLAND
    1800 Washington Blvd.
    Baltimore, MD  21230

STATE OF MINNESOTA
    445 Minnesota Street, Suite 900
    St. Paul, MN 55101-2127

STATE OF NEVADA
    100 N. Carson Street
    Carson City, NV 89701

Case No.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

STATE OF NEW JERSEY
        25 Market Street
        Trenton, NJ 08625

STATE OF NEW MEXICO
        408 Galisteo Street
        Santa Fe, NM 87501

STATE OF NEW YORK
        28 Liberty Street, 19th Floor
        New York, NY 10005

STATE OF NORTH CAROLINA
        P.O. Box 629
        Raleigh, NC 27602

STATE OF OREGON
        1162 Court Street NE
        Salem, OR 97301-4096

STATE OF RHODE ISLAND
        150 South Main Street
        Providence, RI 02903

STATE OF VERMONT
        109 State Street
        Montpelier, VT 05609

STATE OF WASHINGTON
        1125 Washington Street SE
        Olympia, WA 98504

STATE OF WISCONSIN;
        State Capitol, Room 114 East
        Madison, WI 53702

COMMONWEALTH OF MASSACHUSETTS
        One Ashburton Place, 18th Floor
        Boston, MA 02108

COMMONWEALTH OF PENNSYLVANIA
        1600 Arch Street, Suite 300
        Philadelphia, PA 19103

COMMONWEALTH OF VIRGINIA
    202 North 9th Street
    Richmond, VA 23219

PEOPLE OF THE STATE OF MICHIGAN
    525 W. Ottawa St.
    Lansing, MI 48909

DISTRICT OF COLUMBIA
    441 Fourth Street NW
    Suite 650 North
    Washington, D.C. 20001

CITY OF LOS ANGELES
    200 N. Spring Street, 14th Floor
    Los Angeles, CA 90012

CITY OF NEW YORK,
    100 Church Street
    New York, NY 10007

                    Plaintiffs,

    v.

ELAINE L. CHAO, in her capacity as Secretary,
United States Department of Transportation
    1200 New Jersey Ave. SE
    Washington, DC 20590

JAMES C. OWENS, in his capacity as Acting
Administrator, National Highway Traffic Safety
Administration
    1200 New Jersey Ave. SE
    Washington, DC 20590

UNITED STATES DEPARTMENT OF
TRANSPORTATION
    1200 New Jersey Ave. SE
    Washington, DC 20590

NATIONAL HIGHWAY TRAFFIC SAFETY
ADMINISTRATION
    1200 New Jersey Ave. SE
    Washington, DC 20590

UNITED STATES
c/o United States Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530

Defendants.

Plaintiffs, the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington and Wisconsin; the Commonwealths of Massachusetts, Pennsylvania and Virginia; the People of the State of Michigan; the District of Columbia; and the Cities of Los Angeles and New York (collectively, "State Plaintiffs"), allege as follows:

## INTRODUCTION

1.     State Plaintiffs bring this action for declaratory and injunctive relief against final regulations of the National Highway Traffic Safety Administration ("NHTSA") to be codified at 49 C.F.R part 531 and 533 and appendices to those parts. *See* "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," RIN 2127-AM20 (Sept. 19, 2019). ("The Preemption Regulation"). The signed, pre-Federal-Register-publication version of the Preemption Regulation is attached as Exhibit A to this Complaint. State Plaintiffs respectfully request that the Preemption Regulation be declared unlawful and set aside because it exceeds NHTSA's authority, contravenes Congressional intent, and is arbitrary and capricious, and because NHTSA has failed to conduct the analysis required under the National Environmental Policy Act ("NEPA").

4

2.      The Preemption Regulation declares that the federal Energy Policy and

Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 ("EPCA"), preempts state laws that

regulate greenhouse gas emissions from new passenger cars and light trucks. The Preemption

Regulation targets by name the greenhouse gas emission and zero-emission vehicle standards

promulgated by the State of California ("the California standards") and adopted by twelve other

states.

3.      California has had emissions standards for light-duty vehicles for 60 years.

And the California standards at issue in this case are longstanding and fundamental parts of

many State Plaintiffs' efforts to protect public health and welfare in their states, to meet state

goals for the reduction of harmful air pollution including greenhouse gases, and to attain or

maintain federal air quality standards. Indeed, the California standards are one of the most

effective state policies to reduce greenhouse gases and other pollutant emissions from the

transportation sector. The California standards are projected to result in more than 2 million

additional zero-emission vehicles on the road by 2025 and, in the absence of the existing federal

standards, to reduce greenhouse emissions by more than 66 million metric tons per year by 2030,

greater than the amount emitted by all power plants in California.

4.      The federal government has repeatedly approved several State Plaintiffs' use

of the California standards as necessary for a wide variety of purposes. It has granted waivers of

preemption under section 209(b) of the Clean Air Act for both the greenhouse gas (GHG)

standards (which set limits for greenhouse gas emissions from new vehicles) and the zero-

emission vehicle ("ZEV") standards (which require that a certain percentage of new vehicles be

ZEVs). The federal government has also approved both the GHG standards and ZEV standards

as necessary components of several State Plaintiffs' plans to attain National Ambient Air Quality

Standards under the Clean Air Act. And it has approved state reliance on the ZEV standards in determining the pollution impacts of transportation planning decisions. Moreover, for the last decade, the federal government has harmonized its own greenhouse gas emissions standards and its fuel economy standards with the California standards.

5.      California has been regulating vehicle emissions since 1959. Its authority to do so has been repeatedly recognized, reaffirmed, and even expanded by Congress. In a series of statutes and amendments adopted over five decades, including in EPCA itself and bills enacted both before and after its passage, Congress has preserved California's authority to adopt vehicle emissions standards and relied on those standards as a model for the federal government and for other states.

6.      NHTSA's Preemption Regulation flies in the face of this history. It purports to declare that both California's GHG standards and its ZEV standards are expressly preempted because, in NHTSA's current view, they are "related to fuel economy standards" within the meaning of EPCA's preemption provision, 49 U.S.C. § 32919. The Preemption Regulation also purports to declare the California standards conflict-preempted under EPCA.

7.      The United States Environmental Protection Agency (EPA) expressly relies on the Preemption Regulation in its separate action withdrawing a waiver of preemption for the California standards that EPA previously granted under Section 209(b) of the Clean Air Act. Before this action, neither EPA nor NHTSA had ever taken final action premised on the notion that EPCA preempts emissions standards for which California has a waiver of preemption under the Clean Air Act.

8.      Nowhere does Congress, in EPCA or any other statute, authorize NHTSA to issue a regulation declaring that state laws are preempted by EPCA.

9.      The Preemption Regulation is not only in excess of NHTSA's jurisdiction, it is also wrong as a matter of law. NHTSA's position that the California standards—which regulate vehicle emissions, not fuel economy—are preempted by EPCA contravenes EPCA itself, the Clean Air Act, and various amendments to both statutes. It directly conflicts with the decisions of the two federal courts that considered this question and held that California's standards are not preempted by EPCA. It also contradicts the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. 497 (2007), which rejected the federal government's argument that greenhouse gas emissions standards under the Clean Air Act interfered with NHTSA's ability to set fuel economy standards under EPCA.

10.     Other flaws with the Preemption Regulation are evident on its face. The Preemption Regulation declares that California's GHG standards conflict with federal fuel economy standards—despite the fact that California's standards provide that manufacturers may (and many in fact do) comply by meeting federal GHG standards issued in conjunction with federal fuel economy standards.

11.     The Preemption Regulation also declares that California's decades-old ZEV standards are both "related to fuel economy standards" and in conflict with them. Preemption Regulation, p. 50. But EPCA itself demonstrates the opposite. In EPCA, Congress has not authorized NHTSA to set fuel economy standards for vehicles, including ZEVs, that run exclusively on alternative fuels like electricity. And it has prohibited NHTSA from taking the availability of ZEVs into account when setting federal fuel economy standards, meaning that ZEVs do not affect fuel economy standards. 49 U.S.C. § 32902(h)(1).

12.     In addition, NHTSA has failed to consider the damage the Preemption Regulation will inflict on the environment and public health and welfare, flouting the

requirements of NEPA, 42 U.S.C. §§ 4321-4347. Remarkably, NHTSA has conducted no analysis at all of the environmental impacts of a regulation that purports to preempt air pollution laws in effect in states that represent more than a third of the nation's automobile market.

13.     For all of these and other reasons, State Plaintiffs respectfully request that this Court declare the Preemption Regulation unlawful, set it aside, and enjoin its implementation.

## JURISDICTION AND VENUE

14.     Jurisdiction lies in this Court pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. § 706, and the Court's inherent and equitable authority.

15.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2) & (e) because a substantial part of the events or omissions giving rise to the claim occurred in this district. Venue is also proper in that all Defendants, including the federal officials sued in their official capacities, reside in this district.

## PARTIES

### I. PLAINTIFFS

16.     The State of California is a sovereign state in the United States of America. The State of California brings this action by and through Governor Gavin Newsom, the California Air Resources Board, and Attorney General Xavier Becerra. The Governor is the chief executive of California. Cal. Const., art. V, § 1. The California Air Resources Board is the state agency with authority and responsibility for controlling emissions from motor vehicles. Cal. Health & Safety Code §§ 39500, 39600, 40000. The Attorney General is the chief law officer of

California, Cal. Const., art. V, § 13, and is authorized to file civil suits directly involving the state's rights and interests or deemed necessary by the Attorney General to protect public rights and interests. Cal. Gov't Code § 12511; *Pierce v. Superior Ct.*, 1 Cal.2d 759, 761-62 (1934).

17.     The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser. The Attorney General has authority to represent the State, its departments, and its agencies, and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party." Colo. Rev. Stat. § 24-31-101.

18.     The State of Connecticut is a sovereign state of the United States of America. Connecticut brings this action by and through Katie S. Dykes, the Commissioner of Energy and Environmental Protection, and Attorney General William Tong. The Commissioner is charged with the implementation and enforcement of the statutes of the State respecting the environment, including Chapter 446c of the General Statutes, governing air pollution control, and § 14-164c of the General Statutes, governing motor vehicle emissions systems, and is generally empowered by virtue of § 22a-6(a)(3) of the General Statutes to institute legal proceedings necessary to enforce statutes, regulations, permits or orders administered, adopted, or issued by her. The Attorney General has general supervision over all civil legal matters in which the State is an interested party. *See* Conn. Gen. Stat. § 3-125. The Attorney General is authorized to appear in all civil matters for the State, its constitutional officers, members of the General Assembly, and the commissioners and heads of state agencies, departments, boards, committees, and institutions in which the State is a party or is interested, in any court or other tribunal.

19.     The State of Delaware is a sovereign state of the United States of America. Delaware brings this action by and through Shawn M. Garvin, Secretary of the Department of

Natural Resources and Environmental Control, and Attorney General Kathleen Jennings. The

Secretary is charged with the implementation and enforcement of Delaware's statutes of the

respecting the environment, including Chapter 60 of Title 7 of the Delaware Code. The Attorney

General is empowered and charged with the duty to represent as counsel in all proceedings or

actions which may be brought on behalf or against the State and all officers, agencies,

departments, boards, commissions and instrumentalities of state government. *See* 29 Del C.

§ 2504.

20.     The State of Hawaii brings this action by and through its Attorney General,

Clare E. Connors. The Attorney General has authority to represent the State, its departments, and

its agencies, and ". . . shall appear for the State personally or by deputy, in all the courts of

record, in all cases criminal or civil in which the State may be a party, or be interested, and may

in like manner appear in the district courts in such cases." Hawaii Revised Statues §28-1.

21.     The State of Illinois brings this action by and through Attorney General

Kwame Raoul. The Attorney General is the chief legal officer of the State of Illinois (Ill. Const.,

art V, § 15) and "has the prerogative of conducting legal affairs for the State." *Envt'l Prot.*

*Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. Sup. Ct. 1977). He has common law

authority to represent the People of the State of Illinois and "an obligation to represent the

interests of the People so as to ensure a healthful environment for all the citizens of the State."

*People v. NL Indus.*, 604 N.E.2d 349, 358 (Ill. Sup. Ct. 1992).

22.     The State of Maine, represented by and through its Attorney General, is a

sovereign state of the United States of America. The Attorney General of Maine is a

constitutional officer with the authority to represent the State of Maine in all matters and serves

as its chief legal officer with general charge, supervision, and direction of the State's legal

business. Me. Const. art. IX, Sec. 11; 5 M.R.S. §§ 191-205. The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

23.      The State of Maryland is a sovereign state in the United States of America. Attorney General Brian E. Frosh brings this action on behalf of the State of Maryland, including the Maryland Department of the Environment, to protect the public interest and welfare of the residents of the State with respect to protecting the natural resources and environment of the State. Md. Code Ann., State Gov't § 6-106.1(b). The Attorney General has general charge of the legal business of Maryland, Md. Code Ann., State Gov't § 6-106 (LexisNexis 2014), and is authorized to investigate, commence, and prosecute or defend any civil or criminal suit or action that is based on the federal government's action or inaction that threatens the public interest and welfare of the residents of the State with respect to protecting the natural resources and environment of the State, Md. Code Ann., State Gov't § 6-106.1(b) (LexisNexis Supp. 2018).

24.      The State of Minnesota is a sovereign state in the United States of America. Attorney General Keith Ellison brings this action on behalf of Minnesota to protect the interests of Minnesota and its residents. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

11

25.     The State of Nevada is a sovereign state in the United States of America. The State of Nevada brings this action through Attorney General Aaron D. Ford. The Attorney General's powers and duties include acting in federal court in matters of State concern. The Attorney General is authorized to commence legal action in federal court when it is necessary to protect and secure the interest of the State of Nevada. Nev. Rev. Stat. § 228.170(1).

26.     The State of New Jersey is a sovereign state in the United States of America. New Jersey brings this action by and through Attorney General Gurbir S. Grewal as the State's chief law officer. The Attorney General is authorized to file civil suits to vindicate the State's rights and interests, and as he deems necessary to protect the public. N.J. Stat. Ann. § 52:17A-4; *Alexander v. New Jersey Power & Light Co.*, 21 N.J. 373, 380 (1956).

27.     The State of New Mexico brings this action by and through New Mexico Attorney General Hector Balderas, the "attorney for the State of New Mexico," *State ex rel. Norvell v. Credit Bureau of Albuquerque, Inc.*, 1973-NMSC-087, ¶ 5, 85 N.M. 521. The Attorney General's office is recognized in Article V, Section 1 of the New Mexico Constitution and the New Mexico Legislature has authorized the Attorney General to prosecute and defend, in any court, civil actions in which the State is a party, when, in his judgment, the interest of the State requires such action. NMSA 1978, § 8-5-2; *State ex rel. Attorney Gen. v. Reese*, 1967-NMSC- 172, ¶ 14, 78 N.M. 241, 245, 430 P.2d 399.

28.     The State of New York is a sovereign state in the United States of America. Attorney General Letitia James brings this action on behalf of New York and its agencies, including the Department of Environmental Conservation, to protect the interests of New York and its residents, including, but not limited to, protection of state property, protection of residents' health and well-being, and protection of natural resources held in trust by the State.

The Attorney General is authorized to prosecute and defend all actions and proceedings in which the state is interested. New York Executive Law § 63. The Department is authorized to oversee all state programs designed to protect and enhance the environment. New York Environmental Conservation Law § 3-0301.

29.     The State of North Carolina is a sovereign state in the United States of America. The State of North Carolina brings this by and through Attorney General Joshua H. Stein. Attorney General Stein is the chief legal officer of the State of North Carolina. The Attorney General is empowered to appear for the State of North Carolina "in any cause or matter . . . in which the State may be a party or interested." N.C. Gen. Stat. § 114-2(1). Moreover, the Attorney General is authorized to bring actions on behalf of the citizens of the State in "all matters affecting the public interest." N.C. Gen. Stat. § 114-2(8)(a).

30.     The State of Oregon is a sovereign state in the United States of America. The State of Oregon brings this action by and through Governor Kate Brown, the Oregon Department of Environmental Quality, and Attorney General Ellen Rosenblum. The Oregon Attorney General is the chief legal officer of the State of Oregon. The Attorney General's duties include acting in federal court on matters of public concern and upon request by any state officer when, in the discretion of the Attorney General, the action may be necessary or advisable to protect the interests of the state. Ore. Rev. Stat. § 180.060(1).

31.     The State of Rhode Island is a sovereign state in the United States of America. The State of Rhode Island brings this action by and through Attorney General Peter F. Neronha. The Attorney General is the chief law officer of Rhode Island and is authorized to file civil suits directly involving the state's rights and interests or deemed necessary by the Attorney General to protect public rights and interests.

32.     The State of Vermont is a sovereign state in the United States of America. The State of Vermont brings this action through Attorney General Thomas J. Donovan, Jr. The Attorney General is authorized to represent the State in civil suits involving the State's interests, when, in his judgment, the interests of the State so require. 3 V.S.A. Ch. 7.

33.     The State of Washington is a sovereign entity that brings this action on its own behalf to protect state property and on behalf of its citizens and residents to protect their health and well-being and to protect natural resources held in trust by the State. The Attorney General is the chief legal advisor to the State of Washington. The Attorney General's powers and duties include acting in federal court on behalf of state agencies and on matters of public concern. This challenge is brought pursuant to the Attorney General's independent constitutional, statutory, and common law authority to bring suit and obtain relief on behalf of the State of Washington.

34.     The State of Wisconsin is a sovereign state of the United States of America. Attorney General Joshua L. Kaul is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m). The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." Wis. Stat. § 165.25(1m). The State of Wisconsin brings this action by and through its Attorney General, Joshua L. Kaul.

35.     The Commonwealth of Massachusetts is a body politic and a sovereign state of the United States of America. The Commonwealth brings this action by and through its chief legal officer Attorney General Maura Healey on behalf of the Commonwealth and as trustee, guardian, and representative of all residents and citizens of Massachusetts to protect the

14

Commonwealth's sovereign and proprietary interests, including in the protection of its environment and natural resources. *See* Massachusetts Const. Am. Art. 97; Mass. Gen. Laws c. 12, §§ 3 and 11D.

36.    The Commonwealth of Pennsylvania is a sovereign state in the United States of America. The Commonwealth of Pennsylvania brings this action by and through Attorney General Joshua Shapiro. The Attorney General is the chief law officer of Pennsylvania, Pa. Const. art. IV, § 4, and is authorized to file civil suits on behalf of the Commonwealth. 71 P.S. § 732-204.

37.    The Commonwealth of Virginia brings this action by and through Attorney General Mark Herring. The Attorney General is the chief legal officer of the Commonwealth of Virginia. The Attorney General "shall represent the interests of the Commonwealth … in matters before or controversies with the officers and several departments of the government of the United States," Va. Code § 2.2-513, and "all legal service in civil matters for the Commonwealth … including the conduct of all civil litigation in which any of them are interested, shall be rendered and performed by the Attorney General." Va. Code § 2.2-507.

38.    The People of the State of Michigan are the people who live and work in the State of Michigan. The Attorney General of Michigan is the constitutionally established officer who serves as the chief law enforcement officer for the State of Michigan. As Attorney General for the State of Michigan, Dana Nessel is authorized to appear on behalf of the people of Michigan in any matter in which the people may have an interest. Mich. Comp. Laws § 14.28; *see also Assoc. Builders & Contractors v. Perry*, 115 F.3d 386, 390-92 (6th Cir. 1997).

39.    The District of Columbia is a municipal corporation empowered to sue and be sued and is the local government for the territory constituting the permanent seat of the

government of the United States. The District is represented by and through its chief legal officer the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1).

40.     The City of Los Angeles is a municipal corporation within the State of California. The City of Los Angeles brings this suit by and through Michael N. Feuer, the Los Angeles City Attorney, the chief legal officer of the City of Los Angeles. The City Attorney's duties include initiating appropriate legal actions on behalf of the City of Los Angeles, including those to protect the City's interest in environmental and other matters. *See* Los Angeles City Charter Section 271(a).

41.     The City of New York brings this action by and through the Acting Corporation Counsel Georgia Pestana. The Corporation Counsel is the chief legal officer of the City of New York and brings this action on behalf of itself and its residents to protect the New York City's sovereign and proprietary interest in the conservation and protection of its natural resources and the environment. *See* New York City Charter Chap. 17, § 394.

## II. DEFENDANTS

42.     Defendant Elaine L. Chao is the Secretary of Transportation and the highest-ranking official of the United States Department of Transportation. Secretary Chao is sued in her official capacity.

43.     Defendant James C. Owens is the Acting Administrator and highest-ranking official of NHTSA. Acting Administrator Owens is sued in his official capacity

44. Defendant Department of Transportation is a department of the Government of the United States. It is an agency within the meaning of the APA, 5 U.S.C. § 551(1), with headquarters in Washington, D.C.

45. Defendant NHTSA is a component agency within the United States Department of Transportation. 49 U.S.C. § 105(a). It is an agency within the meaning of the APA, 5 U.S.C. § 551(1), with headquarters in Washington, D.C. In this complaint, "NHTSA" is used to refer to both NHTSA and the U.S. Department of Transportation.

46. The United States is named as a defendant pursuant to 5 U.S.C. § 702.

## STATUTORY AND REGULATORY BACKGROUND

### I. FEDERAL AND STATE REGULATION OF VEHICLE EMISSIONS UNDER THE CLEAN AIR ACT PRIOR TO EPCA.

47. The State of California has regulated the emissions of air pollutants from motor vehicles for sixty years. *See* 1959 Cal. Stats. ch. 200, § 1. In 1959, the state legislature assigned to the Department of Public Health the task of establishing "the maximum allowable standards of emissions." *Id.* The Department of Public Health adopted tailpipe emissions standards that, beginning in 1966, required new motor vehicles to reduce hydrocarbon emissions by 80 percent and carbon monoxide emissions by 60 percent as compared to uncontrolled vehicles. The next year, the legislature created the California Air Resources Board ("CARB") and gave it the authority to set motor vehicle emissions standards. In the subsequent decades, CARB would adopt emissions standards for a variety of pollutants from motor vehicles.

48. In 1963, Congress enacted the Clean Air Act, Pub. L. No. 88–206, 77 Stat. 392 (1963), recognizing that "air pollution brought about by … motor vehicles[ ] has resulted in mounting dangers to the public health and welfare," *id*., 77 Stat. at 392-393 (recodified at 42

U.S.C. § 7401(a)(2)). At the time, Congress did not require new federal emissions standards

because "the prevention and control of air pollution at its source is the primary responsibility of

States and local governments," *id.*, 77 Stat. at 393 (recodified as amended at 42 U.S.C. §

7401(a)(3)).

49.     Congress amended the Clean Air Act in 1965 to authorize federal standards for

vehicle emissions that "cause or contribute to, or are likely to cause or contribute to, air pollution

which endangers the health or welfare of any persons." Motor Vehicle Air Pollution Control Act,

Pub. L. No. 89-272, § 101, 79 Stat. 992, 992-993 (1965) (recodified as amended at 42 U.S.C.

§ 7521(a)(1)).

50.     In 1967, Congress enacted the Air Quality Act of 1967, Pub. L. No. 90-148, 81

Stat. 485 (1967), which, in pertinent part, expressly preempted nearly all of the states from

adopting separate new vehicle emissions standards. The automotive industry maintained that it

should only be subject to a single, nationwide standard, and that it would be unduly disruptive to

subject manufacturers to a patchwork of federal and multiple state standards. *Motor and*

*Equipment Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979). But Congress

explicitly allowed California to continue adopting and enforcing its own vehicle emissions

standards through a waiver of preemption that the Secretary of Health, Education, and Welfare

was required to issue unless the state could not meet certain conditions. Pub. L. No. 90-148, § 2,

81 Stat. at 501.

51.     In 1968, California obtained its first waiver of federal preemption under this

provision for standards limiting exhaust emissions of hydrocarbons and carbon monoxide from

1969 model year vehicles. 33 Fed. Reg. 10,160 (July 16, 1968). California received another

waiver the next year for additional emissions standards for oxides of nitrogen (NOx) and other

pollutants. 34 Fed. Reg. 7348 (May 6, 1969). The federal government adopted similar standards for hydrocarbons, carbon monoxide and NOx two years later, using California's standards as a model. *See* 36 Fed. Reg. 3825 (Feb. 27, 1971).

52.    Congress amended the Clean Air Act again in 1970, assigning to the newly established EPA the responsibility to set federal standards for vehicle emissions of any air pollutants that EPA determined were likely to endanger public health or welfare. Pub. L. No. 91-604, §§ 6(a), 15(c)(2), 84 Stat. 1676, 1690, 1713. Interpreting this provision, the Supreme Court had "little trouble concluding" that EPA's authority and duty to set standards extended to emissions of greenhouse gases. *Massachusetts v. EPA*, 549 U.S. 497, 528 (2007). Congress also preserved the Air Quality Act's preemption regime, redesignating it as Section 209 of the Clean Air Act, where it remains today. Pub. L. No. 91-604 § 8(a), 84 Stat. at 1694 (recodified as amended at 42 U.S.C. § 7543).

## II. FEDERAL FUEL ECONOMY REGULATION UNDER EPCA AND EPCA'S TREATMENT OF CALIFORNIA'S VEHICLE EMISSIONS STANDARDS

53.    Congress enacted EPCA in 1975 as a means to reduce petroleum consumption, in response to the oil embargo of 1973 and the instability it created for Americans in the pricing and supply of oil. One of the ways Congress aimed to reduce petroleum consumption under EPCA is through a federal fuel economy program "to provide for improved energy efficiency of motor vehicles." Pub. L. No. 94-163, 89 Stat. 871, 874 (1975).

54.    The statute established numerical average fuel economy standards that automakers' fleets must meet for model years 1978-1980 and directed NHTSA to set numerical average fuel economy standards at the "maximum feasible" level thereafter. *Id.*, § 301, 89 Stat. at 903. The statute also set a minimum fuel economy standard for model year 1985 and thereafter.

55.     Fuel economy standards under EPCA represent the number of miles that the average car in a manufacturer's fleet could travel on a given amount of fuel. EPCA defined fuel, for these purposes, as excluding electricity, limiting it to "gasoline," "diesel oil," or, in certain circumstances, other "liquid" or "gaseous" fuel. *Id.*, § 301, 89 Stat. at 901 (recodified as amended at 49 U.S.C. § 32901(a)(10)).

56.     In addition to setting federal fuel economy standards, Congress also preempted state laws "relating to fuel economy standards or average fuel economy standards applicable to automobiles covered by" an average fuel economy standard prescribed under EPCA. *Id.*, § 301, 89 Stat. at 914. (After a recodification in 1994, "relating to" was replaced by "related to" and "applicable to" was replaced by "for.") Thus, for a state law to be preempted by this provision, there must be a federal fuel economy standard prescribed under EPCA in effect, and that standard has to cover the vehicles to which the state law applies.

57.     By the time Congress enacted this provision in 1975, EPA had issued California a waiver to regulate emissions of carbon monoxide, hydrocarbons, and NOx from light-duty vehicles for model years 1977 and beyond. California State Motor Vehicle Pollution Control Standards; Waiver of Federal Preemption, 40 Fed. Reg. 23,102 (May 28, 1975). Automakers warned that compliance with these standards and future California standards could complicate their ability to comply with fuel economy standards. But rather than preempt California's standards in EPCA, Congress directed NHTSA to take them into account when setting fuel economy standards. Congress did this in two ways.

58.     First, for model years 1978-1980, Congress authorized NHTSA to give individual automakers limited relief from the fuel economy standards Congress set if the manufacturers could show that other "Federal standards" for those model years would make

compliance with fuel economy standards impossible. Pub. L. No. 94-163, § 301, 89 Stat. 871, 904 (adding 15 U.S.C. § 502(d)). Those other "Federal standards" expressly included "emissions standards applicable by reason of Section 209(b) of [the Clean Air] Act," i.e., standards for which California had obtained a waiver. *Id.*, § 301, 89 Stat. at 905 (adding 15 U.S.C. § 502 (d)(3)(D)(i)).

59.     Second, for later model years, Congress directed NHTSA to account for four statutory factors when setting standards. One of those four factors was "the effect of other Federal motor vehicle standards on fuel economy." Pub. L. No. 94-163, § 301, 89 Stat. at 905. Congress directed NHTSA to take this factor into account in determining the "maximum feasible" level of fuel economy standards for model years 1981-84, in deciding whether to deviate from the statutory default level for model years 1985 and beyond, and in considering whether to relax standards for certain small automakers. *Id.* § 301, 89 Stat. at 903-04. In all three contexts, NHTSA has historically interpreted "other Federal motor vehicle standards" to have the same meaning as "Federal standards." In other words, the "other Federal motor vehicle standards" NHTSA was required to take into account included California emissions standards for which EPA had granted a waiver.

60.     Consistent with NHTSA's interpretation, when Congress recodified EPCA in 1994 "without substantive change," it directed NHTSA, in setting federal standards for maximum feasible fuel economy, to consider "other motor vehicle standards of the Government" rather than "other Federal motor vehicle standards." Pub. L. No. 103-272, §§ 1(e), 6(a), 108 Stat. 745, 1060, 1378 (1994).

61.     The consideration EPCA requires NHTSA to give California's standards figured prominently in two district court decisions rejecting the argument that EPCA preempts

California's GHG standards. *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F.

Supp. 2d 295 (D. Vt. 2007); *Cent. Valley Chrysler-Jeep Inc. v. Goldstene*, 529 F. Supp. 2d 1151

(E.D. Cal. 2007). As those courts held, had Congress intended EPCA's preemption provision to

apply to emissions standards for which California has obtained a waiver under section 209(b) of

the Clean Air Act, Congress would not have directed NHTSA to consider such emissions

standards. *Green Mountain*, 508 F. Supp. 2d at 354; *Cent. Valley,* 529 F. Supp. 2d at 1175; *see*

*also Lincoln-Dodge, Inc. v. Sullivan*, 588 F. Supp. 2d 224 (D.R.I. 2008).

62.     Even though NHTSA in general considers the effect of California's emissions

standards when determining the "maximum feasible" level of fuel economy standards, NHTSA

is expressly barred by statute from considering the availability of zero-emission vehicles when

setting standards—regardless of whether California's standards (or other federal or state policies)

promote those vehicles. 42 U.S.C. § 32902(h)(1).

### III. CONGRESS'S CONTINUED EMBRACE OF THE CALIFORNIA STANDARDS AFTER EPCA

#### A. California's waiver authority and the Clean Air Act Amendments of 1977

63.     Two years after enacting EPCA, Congress amended the Clean Air Act in 1977,

making changes to Section 209(b) "to ratify and strengthen the California waiver provision and

to affirm the underlying intent of that provision, i.e., to afford California the broadest possible

discretion in selecting the best means to protect the health of its citizens and the public welfare."

*Motor and Equipment Mfrs. Assn v. EPA*, 627 F.2d 1095, 1110 (D.C. Cir. 1979) (quotation

omitted).

64.     In addition, Congress added Section 177 to the Clean Air Act, allowing other

states to adopt California's standards under specified conditions. Pub. L. No. 95-95, § 129(b), 91

Stat. 685, 750 (1977). Under Section 177, a state is eligible to adopt California's standards if the

state has obtained approval from EPA for State Implementation Plan provisions under Part D of

Subchapter I of the Clean Air Act. 42 U.S.C. § 7507. States that have adopted California's

standards are often called "Section 177 states."

### B. California's ZEV Standards and the Clean Air Act Amendments of 1990

65.     California first adopted its zero-emission vehicle standards in 1990. The ZEV

standards mandate that a certain percentage of the fleets automakers manufacture for sale in

California be ZEVs. The 1990 ZEV standards were part of a set of regulations implementing a

state law requiring vehicle standards that would "achieve the maximum degree of emission

reduction possible." Cal. Health & Safety Code § 43018(a). CARB designed these standards,

including the ZEV standards, to target carbon monoxide, oxides of nitrogen, non-methane

organic gas, particulate matter, and formaldehyde. *See* 13 Cal. Code Regs. § 1960.1.

66.     CARB obtained a Clean Air Act section 209(b) waiver from EPA for these

standards, including the ZEV standards, in 1993. 58 Fed. Reg. 4166 (Jan. 13, 1993). And it has

received additional waivers for subsequent amendments to, and extensions of, the ZEV

standards. *See* 71 Fed. Reg. 78,190, 78,190-91 (Dec. 28, 2006), 76 Fed. Reg. 61,095, 61,095-96

(Oct. 3, 2011), and 78 Fed. Reg. 2112, 2114-15 (Jan. 9, 2013).

67.     A few months after CARB adopted the initial ZEV standards, in 1990,

Congress amended the Clean Air Act to instruct EPA to issue regulations defining a ZEV in a

manner "conform[ing] as closely as possible to standards which are established by the State of

California for … ZEV vehicles." 42 U.S.C. § 7586(f)(4). EPA thereafter issued regulations

adopting CARB's definition of ZEV wholesale. Emission Standards for Clean-Fuel Vehicles and

Engines, Requirements for Clean-Fuel Vehicle Conversions, and California Pilot Test Program,

59 Fed. Reg. 50,042, 50,050 (Sept. 30, 1994); *see also* 40 C.F.R. § 88.104─94(g).

23

### C. California's Initial Greenhouse Gas Standards and the Energy Independence and Security Act of 2007

68.     In 2002, the California Legislature required CARB to set standards for vehicle GHG emissions for model years 2009 through 2016. 2002 Cal. Stats. ch. 200 (amending Cal. Health & Safety Code § 42823 and adding § 43018.5). Pursuant to that authority, in 2005, CARB promulgated such standards applicable to model years 2009 and later. *See* 13 Cal. Code Regs. § 1961.1. As CARB described in its initial statement of reasons for adopting these standards, they were aimed at limiting climate-changing emissions from four primary sources, not just fuel use: (1) carbon dioxide, methane, and nitrous oxide emissions from vehicle operation; (2) carbon dioxide emissions from operating the air conditioning system; (3) refrigerant emissions from the air conditioning system due to leakage, recharging, or scrappage; and (4) upstream emissions from production of the fuel used by the vehicle. Similarly unlike NHTSA's fuel economy standards, but like CARB's other emissions standards, they applied to all future model years and not a limited number. Penalties for violating California's GHG standards are assessed separately from and independent of any penalties that might also be assessed for violating federal fuel economy standards.

69.     CARB subsequently submitted a request to EPA for a waiver under Section 209 of the Clean Air Act. Many Section 177 states took action to adopt California's GHG vehicle emissions standards.

70.     The adoption of these standards was challenged by auto dealers and manufacturers and litigated in two federal district courts. In 2007, both courts reached the same conclusions: EPCA does not preempt emissions standards for which California has a waiver, and California's GHG standards are neither "related to fuel economy standards" nor in conflict with

them. *Green Mountain*, 508 F. Supp. 2d at 350 (rejecting challenge to Vermont's adoption of

California's GHG standards); *Cent. Valley*, 529 F. Supp. 2d at 1176 (rejecting challenge to

California's adoption of GHG standards). The same year, the U.S. Supreme Court held, in

*Massachusetts v. EPA*, 549 U.S. 497 (2007), that the Clean Air Act authorized GHG standards

for new motor vehicles and that NHTSA's mandate to promote fuel efficiency by setting fuel

economy standards in no way curtailed EPA's Clean Air Act authority and responsibility with

respect to air pollution.

71.     Subsequent to these decisions, Congress enacted the Energy Independence and

Security Act of 2007 ("EISA"). Pub. L. No. 110-140, 121 Stat. 1517 (2007). Among other

things, that law amended federal agency vehicle acquisition rules to require that federal agencies

acquire only "low greenhouse gas emitting vehicles." 42 U.S.C. § 13212(f)(2)(A). Congress

simultaneously required EPA to determine which vehicles qualify as "low greenhouse gas

emitting vehicles" by taking into account "the most stringent standards for vehicle greenhouse

gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles

sold anywhere in the United States." *Id.* § 13212(f)(3)(B). At the time of EISA's passage, the

only such GHG standards that existed were California's. H.R. Rep. 110-297, pt. 1, at 17 (2007).

72.     In deliberations over EISA, Congress rejected multiple attempts to amend the

bill to revoke or interfere with California's authority to set its own GHG standards. Instead, it

enacted a savings clause that expressly preserved existing state authority to regulate GHG

emissions. 42 U.S.C. § 7545(o)(12).

## IV. THE NATIONAL PROGRAM

73.     During 2008 and into 2009, there were multiple parallel developments

involving the regulation of GHG emissions from new light-duty vehicles. The auto dealer and

vehicle manufacturer plaintiffs were appealing the district court decisions that had held that EPCA did not preempt California's GHG standards. In July 2009, after reconsidering an initial denial, EPA granted California's waiver for its GHG standards beginning with model year 2009. 74 Fed. Reg. 32,744 (July 8, 2009). That decision was then challenged by an association of auto dealers and the U.S. Chamber of Commerce. Meanwhile, following the remand from the Supreme Court in *Massachusetts v. EPA*, EPA was determining whether greenhouse gas emissions from motor vehicles endanger public health and welfare, in which case EPA would be required to regulate those emissions. In late 2009, EPA took the first of these steps, issuing a finding that emissions of greenhouse gases from new motor vehicles endanger public health and welfare. 74 Fed. Reg. 66,496 (Dec. 15, 2009). That decision was also unsuccessfully challenged in court. *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102 (D.C. Cir. 2012) *affirmed in part and reversed in part Util. Air Regulatory Grp. v. EPA,* 573 U.S. 302 (2014).

74. In response to these and other circumstances, EPA, NHTSA, and CARB—with automaker support—developed a single, coordinated "National Program" of vehicle emission and fuel economy standards for model years 2012-2016. The National Program was "[t]he product of an agreement between the federal government, California, and the major automobile manufacturers" that "make[s] it possible for automobile manufacturers to sell a 'single light-duty national fleet' that satisfies the standards of the EPA, NHTSA, California, and the Section 177 states." *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 198 (D.C. Cir. 2011). "Pursuant to that agreement, California amended its regulations to deem compliance with the national [emissions] standards [adopted in 2010 as] compliance with its own," *id*., and EPA and NHTSA harmonized their emission and fuel economy standards, 75 Fed. Reg. 25,324 (May 7, 2010). The

Section 177 states took steps as necessary to incorporate California's "deemed-to-comply" modification into their regulatory programs.

75.     EPA promulgated the first federal GHG emissions standards, for model years 2012-2016. 75 Fed. Reg. 25,324 (May 7, 2010). EPA's standards were based largely on California's GHG standards. EPA's GHG standards were also promulgated as part of a joint rulemaking package with NHTSA, which was required by EPCA (as amended by EISA) to set increasingly stringent fuel economy standards for those same model years.

76.     Meanwhile, President Barack Obama directed EPA and NHTSA to work with California to develop GHG and fuel-economy standards for light-duty vehicles for model years 2017-2025. 76 Fed. Reg. 48,758 (Aug. 9, 2011). And, in July 2011, automakers, California, and the federal government committed to a series of actions that would allow for the development of national greenhouse gas standards (and complementary fuel economy standards) for model years 2017 through 2025.

77.     Accordingly, EPA and NHTSA promulgated greenhouse gas emissions standards and fuel economy standards, respectively, for model year 2017-2025 vehicles. 77 Fed. Reg. 62,624 (Oct. 15, 2012). Unlike EPA's greenhouse gas standards, the fuel economy standards NHTSA finalized in that action were legally binding only for model years 2017-2021, because EPCA prohibits NHTSA from setting standards for more than five model years at a time. *Id*. Although NHTSA "presented" standards for the four model years 2022 through 2025, it labeled the standards for those years as "augural," in that they augured future standards but did not set them. *See id*. at 62,6329-30 n. 8. NHTSA has not prescribed any fuel economy standards under EPCA that will be in effect beyond model year 2021. *Id*. at 62964.

78.     The federal government and California also extended the National Program agreement to apply to standards for model year 2017-2025 vehicles. *Id*. at 62,638. Among other commitments, California again agreed to deem compliance with EPA's emissions standards as compliance with California's, provided that the reductions EPA projected for those model years "are maintained." *Id*. And Section 177 states again took steps, as necessary, to incorporate the deemed-to-comply provision.

79.     Consistent with its commitments under the National Program, California adopted new GHG standards and amended its ZEV standards in 2012. California's regulatory changes applied beginning with model year 2017, increasing in stringency through 2025, and continuing thereafter. California obtained a waiver for its GHG and ZEV standards in 2013. 78 Fed. Reg. 2112 (Jan. 9, 2013).

80.     In addition to California, twelve states have adopted California's GHG standards, including Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont and Washington. Most of these states have also adopted California's ZEV standards.

81.     Collectively, the states that have adopted California's GHG standards comprise more than one-third of the nation's auto market.

**V. The Ongoing Importance of the California Standards**

82.     California's GHG standards and ZEV standards, in purpose and effect, both reduce emissions of various pollutants and encourage the development and deployment of emissions-reducing technologies. Neither conflict with Congress's objectives in EPCA.

83.     On their own (i.e. in the absence of the existing federal standards, which cover only some model years and which EPA has proposed to weaken), the California standards would

reduce GHG emissions in California alone by approximately 14.4 million metric tons of carbon

dioxide a year by 2025 and 25.2 million metric tons a year by 2030. Those numbers more than

double when the benefits of implementation in the Section 177 states are included.

84.     Between California and Section 177 states, the ZEV standards are projected to

result in the sale of approximately 2.4 million additional zero-emission vehicles by 2025, half in

California and half in Section 177 states.

85.     The GHG and ZEV standards are fundamental to State Plaintiffs' efforts to

protect public health and welfare. For example, in California, passenger vehicles and other

mobile sources (comprising on- and off-road vehicles and equipment) are the largest sources of

both smog-forming oxides of nitrogen (NOx) and greenhouse gases, which exacerbate air

pollution as they warm the climate. Because of these emissions, millions of Californians—

including more than 12 million in the South Coast air basin alone—still breathe unhealthy air

and suffer, as a result, increased rates of respiratory and cardiovascular health impacts and

premature death. Vehicle emissions, in particular, must be significantly reduced to achieve the

ozone National Ambient Air Quality standards by the deadlines under the Clean Air Act,

including in heavily impacted extreme nonattainment areas of the South Coast and San Joaquin

Valley, and to reduce California's greenhouse gas emissions by over 40 percent below 1990

levels by 2030, as required under state law. The GHG and ZEV standards are also crucial to

implementing California state law requiring the reduction of emissions near concentrated

populations, especially those already over-burdened by pollution. *See* California Assembly Bill

617, 2017 Cal. Stats. ch. 136.

86.     The ZEV standards are a necessary part of California's efforts to meet National

Ambient Air Quality Standards, especially in the extreme ozone nonattainment areas in the South

Coast and San Joaquin Valley, where mobile source emissions have been the largest contributors to toxic air pollution and to the formation of urban smog. EPA has thus approved California's ZEV standards for model years 2018 and later into California's State Implementation Plan for attainment of National Ambient Air Quality Standards. 81 Fed. Reg. 39,424, 39,425 (June 16, 2016). For similar reasons, other Section 177 states have the GHG standards, the ZEV standards, or both approved into their State Implementation Plans.

87.     California, with EPA approval, relies on the ZEV standards to demonstrate conformity with the Clean Air Act for purposes of transportation funding. Under the Clean Air Act's transportation conformity requirements, states cannot obtain federal transportation funding for projects unless they can demonstrate that those projects are consistent with the relevant State Implementation Plans. California makes this demonstration based, in part, on emission modeling that presumes the ZEV regulations are in effect, using California's EMissions FACtor ("EMFAC") model. EPA has approved the 2017 version of EMFAC for these purposes, 84 Fed. Reg. 41,717 (Aug. 15, 2019), and previously approved the prior 2014 version, 80 Fed. Reg. 77,337 (Dec. 14, 2015). Both of these versions include the ZEV standards.

## V. THE PREEMPTION REGULATION

88.     NHTSA proposed the Preemption Regulation as part of a joint EPA-NHTSA rulemaking package published in the Federal Register on August 24, 2018. 83 Fed. Reg. 42,986 ("The Proposed Regulation"). As part of that same package, NHTSA proposed to weaken the existing fuel economy standard for model year 2021 so that it would be no more stringent than the model year 2020 level. NHTSA also proposed to set new fuel economy standards at that same level for model years 2022-2026. EPA proposed to weaken existing federal GHG standards

for model years 2021-2026 so that they would likewise be frozen at model year 2020 levels and to revoke California's waiver for California's GHG and ZEV standards.

89.     NHTSA's final Preemption Regulation was signed by Defendant Owens on September 19, 2019. The final Preemption Regulation was not accompanied by any action changing or setting NHTSA fuel economy standards or EPA's GHG standards, although these actions were proposed together as discussed above. However, the Preemption Regulation does appear in the same pre-publication Federal Register notice as EPA's final decision to revoke the waiver for the California standards. EPA's decision expressly relies on the Preemption Regulation as a basis for revocation of the waiver.

90.     Contrary to the court rulings in *Green Mountain* and *Central Valley*, the Preemption Regulation asserts that all state laws regulating or prohibiting tailpipe GHG emissions are both expressly and implicitly preempted by EPCA. The Preemption Regulation further says that all state laws with the "direct or substantial effect of" regulating or prohibiting tailpipe GHG emissions are likewise expressly and implicitly preempted by EPCA. Preemption Regulation, p. 81. The Preemption Regulation says these state laws are void *ab initio* and that whether or not they have a waiver of preemption from EPA is irrelevant to the question of whether or not they are preempted by EPCA. *Id.*, p. 181.

91.     Likewise, although NHTSA has long interpreted EPCA as requiring consideration of the effect California's waiver standards have on fuel economy, NHTSA does not acknowledge, let alone address, that position in the Preemption Regulation.

92.     The Preemption Regulation also declares that California's GHG standards conflict with NHTSA's fuel economy standards, even though automakers have been able to meet

California's GHG standards by complying with the federal greenhouse gas standards that were
issued in a joint rulemaking with NHTSA's fuel economy standards.

93.    In the preamble to the Proposed Regulation, NHTSA claimed to have complied
with the requirements of Executive Order 13132, which imposes requirements on agencies that
promulgate regulations with federalism implications. The order has particular requirements for
preemption regulations. Among other things, it requires that agencies must consult with states
early in the process of developing the proposed regulation. In the preamble to the Proposed
Regulation, NHTSA said "[t]he agencies complied with Order's requirements." NHTSA did not
articulate a basis for this statement.

94.    NHTSA did not consult with State Plaintiffs regarding the Preemption
Regulation, let alone do so early in the process of developing the proposal. For instance, NHTSA
did not meet with California or the California Air Resources Board regarding the Preemption
Regulation. Nor did NHTSA meet with any Section 177 states regarding the Preemption
Regulation.

95.    The State of New York filed a supplemental comment and requested, pursuant
to the Information Quality Act, that NHTSA correct its statement in the Proposed Regulation that
it consulted with states about the federalism impacts of its proposed rule. *See* Supplemental
Comment submitted by Letitia James, New York Attorney General, et al., July 23, 2019, Docket
Nos. EPA-HQ-OAR-2018-0283, NHTSA-2018-0067,
https://www.regulations.gov/document?D=EPA-HQ-OAR-2018-0283-7589.

96.    In the final rule, NHTSA claimed falsely that it complied with Executive Order
13132, pointing to its use of notice-and-comment procedures as evidence of its asserted
compliance. NHTSA failed to explain how notice and comment after release of a proposed

regulation satisfies the detailed early consultation requirements specified in Section 6(b)(2)(A) of Executive Order 13132, which calls for consultation "early in the process of developing the proposed regulation." NHTSA nowhere disputes the fact that it failed to directly consult with officials in California and the Section 177 states to determine, *inter alia*, whether NHTSA's objectives can be attained by other means and whether alternatives exist that would preserve state prerogatives and authority.

97.     NHTSA also stated in the preamble to the Preemption Regulation that, despite purporting to preempt state laws previously determined to be necessary to meet National Ambient Air Quality standards, NHTSA had not taken any action that would frustrate states' ability to attain the standards.

98.     In the preamble to the Preemption Regulation, NHTSA asserts that its action is not subject to the Clean Air Act's transportation conformity requirements. NHTSA did not use or address California's EMFAC models, approved by EPA for California's transportation conformity demonstration, in supporting that statement.

99.     NHTSA also failed to comply with NEPA when it issued the Preemption Regulation. NHTSA contends that it "is not obligated to analyze or consider … environmental impacts" of the Preemption Regulation, p. 190, because "NEPA does not apply to this action," p. 187. Elsewhere, NHTSA asserts that, in any event, the Preemption Regulation—despite purporting to preempt emissions standards in thirteen states—"does not result in significant environmental impacts to the quality of the human environment." Preemption Regulation, p. 188.

## VI. THE ADMINISTRATIVE PROCEDURE ACT

100.     The Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., establishes procedural requirements for federal agency decision making, including agency rulemakings.

Under the APA, a "reviewing court shall … hold unlawful and set aside" agency action that

exceeds the agency's statutory jurisdiction or that is arbitrary, capricious, or contrary to law. 5

U.S.C. § 706.

101.   To satisfy the requirement for decision making that is not arbitrary or

capricious, the "agency must examine the relevant data and articulate a satisfactory explanation

for its action including a rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation

marks omitted).

102.   By contrast, agency action is arbitrary and capricious:

> if the agency has relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation for its
> decision that runs counter to the evidence before the agency, or is so implausible that it
> could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

103.   When agency action represents a change from the agency's previous position,

the agency must "display awareness that it *is* changing position," show that "there are good

reasons" for the reversal, and demonstrate that its new policy is permissible under the statute.

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

104.   If the agency's new position "rests upon factual findings that contradict those

which underlay its prior policy," the agency must "provide a more detailed justification than

what would suffice for a new policy created on a blank slate." *Id*. An agency must likewise

provide "good reasons" for departing from prior policies and precedents that have "engendered

serious reliance interests that must be taken into account." *Encino Motorcars, LLC v. Navarro*,

136 S.Ct. 2117, 2126 (2016).

105.     Prior to promulgating a rule, agencies must engage in a notice-and-comment process, and consider comments submitted by the public. 5 U.S.C. §§ 551(5), 553. The agency "need not respond to every comment, but it must respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule." *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir. 1983), *opinion supplemented by*, 713 F.2d 795 (D.C. Cir. 1983) (quotation omitted).

## VII. THE NATIONAL ENVIRONMENTAL POLICY ACT

106.     NEPA is the "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1. The fundamental purposes of the statute are to ensure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken," and that "public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id*. § 1500.1(b)-(c).

107.     To achieve these purposes, NEPA requires the preparation of a detailed environmental impact statement for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "Major Federal action" includes "[a]doption of official policy, such as rules, regulations, and interpretations." 40 C.F.R. § 1508.18(b)(1).

108.     The preparation of an environmental impact statement not only forces the federal agency to consider these impacts on the environment but it also guarantees that the relevant information will be made public so that interested parties may play a role in both the decision making process and the implementation of that decision. *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348 (1989).

109.    Before preparing an environmental impact statement, an agency may first prepare an environmental assessment to determine whether the effects of an action may be significant. 40 C.F.R. § 1508.9. If an agency decides to not prepare an environmental impact statement, its environmental assessment

> must 1) accurately identif[y] the relevant environmental concern, 2) take a hard look at the problem in preparing its EA, 3) make a convincing case for its finding of no significant impact, and 4) show that even if a significant impact will occur, changes or safeguards in the project sufficiently reduce the impact to a minimum.

*New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 477 (D.C. Cir. 2012) (quotation marks omitted).

110.    NHTSA's own regulations identify various types of actions that should "ordinarily be considered" to be major actions significantly affecting the environment, and therefore requiring an environmental impact statement. These include actions that "involve[] inconsistency with any Federal, State, or local law or administrative determination relating to the environment," 49 C.F.R. § 520.5(b)(6)(i), that "may directly or indirectly result in a significant increase in the energy or fuel necessary to operate a motor vehicle," *id*., § 520.5(b)(8); or that "may directly or indirectly result in a significant increase in the amount of harmful emissions resulting from the operation of a motor vehicle," id., § 520.5(b)(9).

111.    NHTSA's regulations also require preparation of an environmental impact statement for "any proposed action which is likely to be controversial on environmental grounds," *id.*, § 520.5(a)(2), and for "any proposed action which has unclear but potentially significant environmental consequences," *id.*, § 520.5(a)(3). All of these standards apply to "[r]ulemaking and regulatory actions." *Id.* § 520.4(b)(3).

112.   Because NEPA does not provide a private right of action, claims that agencies have violated NEPA must be brought pursuant to the Administrative Procedure Act. *See Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).

## STANDING

113.   The Preemption Regulation purports to preempt existing laws of several State Plaintiffs and to prevent all State Plaintiffs from adopting others. It also provides a basis—albeit an improper one—for EPA's revocation of California's Clean Air Act waiver for those laws, and potentially influences other proceedings involving those laws. The Preemption Regulation thus injures State Plaintiffs' sovereign interests by infringing on State Plaintiffs' authority and interfering with State Plaintiffs' ability to address greenhouse gas emissions and other air pollution.

114.   The Preemption Regulation will injure State Plaintiffs' sovereign, quasi-sovereign, and proprietary interests by causing increases in greenhouse gas emissions. Those increased emissions will interfere with several State Plaintiffs' ability to meet their greenhouse gas reduction targets or mandates. The increased emissions will also contribute to and exacerbate the ongoing and future impacts of climate change in Plaintiff states. These impacts include, among others,

- loss of sovereign territory, including state-owned land, in coastal states due to sea-level rise;

- damage to state-owned parks and infrastructure;

- lost tax revenue resulting from harm to agriculture, fishing, forestry, outdoor recreation, tourism, and other industries;

- increased costs to public health and safety programs, including state-run hospitals, public water systems, and fire suppression efforts.

115.    The Preemption Regulation will injure State Plaintiffs' sovereign, quasi-sovereign, and proprietary interests by causing increases in emissions of so-called criteria pollutants and their precursors, including carbon monoxide, oxides of nitrogen, particulate matter, sulfur dioxide and volatile organic compounds. These increases will interfere with several State Plaintiffs' ability to attain or maintain National Ambient Air Quality Standards and the similar state laws and mandates, imposing increased regulatory burdens on State Plaintiffs. These emissions increases will also result in damage to the health of their citizens that will, in turn, increase health care costs for State Plaintiffs; in lost days of work and school; and in damage to vegetation that will, in turn, harm state-owned parks and the agriculture, outdoor recreation, and tourism industries.

116.    The Preemption Regulation injures State Plaintiffs' informational and procedural interests by depriving them of NEPA-required analysis of the impact of preempting state air pollution laws and the ability to comment on such analysis.

117.    State Plaintiffs have suffered and will suffer legal wrongs and concrete injuries as a result of NHTSA's Preemption Regulation. Declaring the Preemption Regulation unlawful and setting it aside will redress these harms suffered by State Plaintiffs.

## FIRST CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act—Exceedance of statutory jurisdiction)

118.    The foregoing allegations are re-alleged herein by reference.

119.    The Preemption Regulation is a "final agency action" within the meaning of the APA, 5 U.S.C. § 704.

120.    Under the APA, this Court shall "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C).

121.    Congress has not delegated to NHTSA any authority to issue a regulation or other legally effective determination under EPCA regarding express or implied preemption under EPCA, nor to adopt regulations declaring particular state laws, or categories of state laws, preempted by EPCA.

122.    Congress authorized NHTSA to issue regulations under EPCA only to carry out NHTSA's "duties and powers." 49 U.S.C. § 322; *see also* 49 U.S.C. § 32910(d) ("The Administrator may prescribe regulations to carry out duties of the Administrator under this Chapter."). The Preemption Regulation does not carry out any of NHTSA's duties or powers under EPCA.

123.    The Preemption Regulation was adopted in excess of NHTSA's authority, and must be declared unlawful and set aside.

## SECOND CLAIM FOR RELIEF

### (*Ultra vires* action)

124.    The foregoing allegations are re-alleged herein by reference.

125.    Neither executive agencies nor executive officers can take action unless authority has been delegated to them, whether by Congress, the Constitution, or some other source. When an executive officer takes *ultra vires* action outside of that authority, courts may intervene to declare and reestablish limits of executive branch authority, and protect the rights of injured parties through the courts' equitable jurisdiction.

126.    The Preemption Regulation is completely outside of and beyond any authority

delegated to Defendants. The Preemption Regulation does not identify any statute or other

authority that authorizes the regulation.

127.    Through the Preemption Regulation, Defendants have taken *ultra vires* action

contrary to the separation of powers and infringing upon historic state police powers.

128.    Accordingly, the Preemption Regulation must be declared unlawful and set

aside.

**THIRD CLAIM FOR RELIEF**

**(Violation of the Administrative Procedure Act—arbitrary, capricious, contrary to law,**

**and unwarranted by the facts)**

129.    The foregoing allegations are re-alleged herein by reference.

130.    Under the Administrative Procedure Act, this Court shall "hold unlawful and

set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right," *id.* § 706(2)(B),

or "unwarranted by the facts," *id*. § 706(2)(F).

131.    The Preemption Regulation is contrary to law because it interprets EPCA as

expressly and implicitly preempting state laws regulating or prohibiting—or "having the direct or

substantial effect of regulating or prohibiting," p. 224—tailpipe greenhouse gas emissions,

regardless of whether EPA has waived Clean Air Act preemption of those laws under Section

209(b) of the Clean Air Act. The Preemption Regulation is contrary to law because it conflicts

with Congressional intent, as recognized by the Supreme Court, to establish two distinct

statutory schemes for the separate regulation of vehicle emissions and fuel economy. The

Preemption Regulation wrongly interprets Congress's adoption of EPCA as implicitly revoking

40

California's authority to set vehicle emissions standards, at least with respect to GHGs. That interpretation is contrary to Congress's direction in EPCA that NHTSA consider and give effect to California's emissions standards. It is also contrary to further Congressional action reaffirming and expanding California's authority to set vehicle emissions standards that Congress recognized could affect fuel economy, including the 1977 amendments to the Clean Air Act and the 1994 recodification of EPCA.

132.    The Preemption Regulation also is contrary to law because it disregards Congress's express recognition of California's GHG standards in EISA and Congress's express recognition of California's ZEV standards in the 1990 amendments to the Clean Air Act.

133.    The Preemption Regulation violates NHTSA's general conformity obligations under Section 176 of the Clean Air Act to refrain from taking actions that frustrate states' ability to attain or maintain National Ambient Air Quality Standards. 42 U.S.C. § 7506; *see also* 40 C.F.R. Part 93, subpart B. By purporting to declare preempted the California standards that have previously been recognized as necessary for several State Plaintiffs' to attain or maintain those National Ambient Air Quality Standards, NHTSA's action will cause increased criteria pollutant levels in the ambient air and interfere with State Plaintiffs' efforts to attain or maintain those standards. In conjunction with other reasonably foreseeable actions, the Preemption Regulation will contribute to new violations of NAAQS in nonattainment or maintenance areas in a manner that will increase the frequency or severity of the new violations.

134.    The Preemption Regulation is arbitrary and capricious because it does not "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quotation marks omitted).

135.    The Preemption Regulation fails to adequately explain NHTSA's departure from its long-held position that EPCA requires the consideration of emissions standards for which California has a waiver.

136.    The Preemption Regulation is unlawful and arbitrary and capricious because it violates and fails to consider EPCA's objectives of conserving energy and promoting the development of vehicles powered by less conventional energy sources such as electricity.

137.    The Preemption Regulation is arbitrary and capricious because NHTSA fails to adequately explain how preemption of laws necessary to meet federal air quality standards does not interfere with states' ability to meet those standards.

138.    The Preemption Regulation is arbitrary and capricious because it fails to address or consider state reliance, approved by EPA, on the ZEV standards for purposes of transportation conformity demonstrations under Section 176 of the Clean Air Act. 42 U.S.C. § 7506.

139.    The Preemption Regulation is unwarranted by the facts because it purports to declare that California's standards conflict with the congressional objectives for EPCA. But NHTSA has not identified, and cannot identify, any actual evidence of such conflict, despite the fact that California has had enforceable ZEV standards for more than 20 years and GHG standards for 9 years.

140.    Accordingly, the Preemption Regulation must be declared unlawful and set aside.

**FOURTH CLAIM FOR RELIEF**

**(Violation of Administrative Procedure Act—Failure to comply with NEPA)**

141.    The foregoing allegations are re-alleged herein by reference.

42

142.    NHTSA has committed to "carry out the full intent and purpose of [NEPA] and related orders and statutes, and take positive steps to avoid any action which could adversely affect the quality of the human environment." 49 C.F.R. § 520.2. Under NHTSA's regulations, NEPA applies to "rulemaking and regulatory actions," *id*. § 520.4(b)(3), including the Preemption Regulation.

143.    NHTSA asserts that NEPA does not apply to the Preemption Regulation. Relying on that assertion, NHTSA entirely failed to comply with NEPA, its implementing regulations, and NHTSA's own regulations by not preparing any "environmental document" in connection with the Preemption Regulation. 40 C.F.R. § 1508.10.

144.    NHTSA asserts that the Preemption Regulation "does not result in significant environmental impacts to the quality of the human environment." Preemption Regulation, p. 191. That assertion is arbitrary, capricious, and an abuse of discretion. For example, NHTSA failed to adequately consider the environmental effects of eliminating ZEV standards in California and other Section 177 States. These effects are a reasonably foreseeable result of the Preemption Regulation, given that EPA relied on the Preemption Regulation as a basis to revoke California's waiver of preemption for those standards. NHTSA likewise failed to adequately consider the reasonably foreseeable effects of state GHG standards being eliminated in the Preemption Regulation and the proposal to weaken the federal standards being finalized in a rule EPA and NHTSA "anticipate issuing … in the near future." *Id.*, p. 2.

145.    NHTSA's assertion that the Preemption Regulation does not significantly affect the quality of the human environment is not a valid Finding of No Significant Impact because the agency did not prepare the prerequisite Environmental Assessment. See 40 C.F.R. § 1508.13. Under NEPA and implementing regulations of the Council on Environmental Quality

and NHTSA, the Preemption Regulation is a "major Federal action" that significantly affects the quality of the human environment and requires preparation of an environmental impact statement. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1508.18(b)(1); 49 C.F.R. §§ 520.4, 520.5. NHTSA violated NEPA by failing to prepare an environmental impact statement.

146.    Defendants promulgated the Preemption Regulation without observance of procedures required by the law. 5 U.S.C. § 706(2)(D). Further, NHTSA's actions and failures are arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA, its implementing regulations, NHTSA's regulations, and the APA. 5 U.S.C. § 706(2)(A).

147.    Accordingly, the Preemption Regulation must be declared unlawful and set aside.

## PRAYER FOR RELIEF

WHEREFORE, State Plaintiffs respectfully request that this Court enter a judgment:

1.    Declaring that the Preemption Regulation is *ultra vires*;

2.    Declaring that the Preemption Regulation violates the APA;

3.    Declaring that the Preemption Regulation violates NEPA;

4.    Declaring that the Preemption Regulation is unlawful and that its legal conclusions are inconsistent with EPCA, the Clean Air Act, and EISA.

5.    Holding unlawful and setting aside the Preemption Regulation;

6.    Granting a permanent injunction prohibiting Defendants from implementing or relying on the Preemption Regulation;

7.    Awarding State Plaintiffs costs, expenses, and reasonable attorneys' fees;

8.    Awarding such other relief as the Court deems just and proper.

Dated: September 20, 2019

Respectfully Submitted,

FOR THE STATE OF CALIFORNIA

XAVIER BECERRA
ATTORNEY GENERAL
Robert W. Byrne
Sally Magnani
Senior Assistant Attorneys General
David A. Zonana
Gary Tavetian
Supervising Deputy Attorneys General
*/s/**Jonathan A. Wiener**
Jonathan A. Wiener
Jessica Barclay-Strobel
Kavita Lesser
M. Elaine Meckenstock
Deputy Attorneys General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
(415) 510-3549

*Attorneys for the State of California, by and through Governor Gavin Newsom, the California Air Resources Board, and Attorney General Xavier Becerra*

FOR THE STATE OF COLORADO

PHIL WEISER
COLORADO ATTORNEY GENERAL
*/s/ Eric R. Olson*
Eric R. Olson
Solicitor General
Office of the Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6562
eric.olson@coag.gov

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
ATTORNEY GENERAL OF THE
STATE OF DELAWARE
*/s/ Kayli H. Spialter*
Kayli H. Spialter
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 6th Floor
Wilmington, DE 19801
Kayli.spialter@delaware.gov
(302) 395-2604

FOR THE STATE OF ILLINOIS

KWAME RAOUL
ATTORNEY GENERAL
*/s/ Jason E. James*
Jason E. James
Assistant Attorney General
Matthew J. Dunn Chief, Environmental
Enforcement/Asbestos Litig. Div.
Daniel I. Rottenberg
Assistant Attorney General
69 West Washington St.
18th Floor
Chicago, IL 60602
(312) 814-0660
jjames@atg.state.il.us

FOR THE STATE OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL
*/s/ Matthew I. Levine*
Matthew I. Levine
Scott N. Koschwitz
Assistant Attorneys General
Office of the Attorney General
P.O. Box 120, 55 Elm Street
Hartford, CT 06141-0120
(860) 808-5250

FOR THE STATE OF HAWAII

CLARE E. CONNORS
ATTORNEY GENERAL
*/s/ William F. Cooper*
William F. Cooper
Deputy Attorney General
State of Hawaii Office of the Attorney
General
425 Queen Street,
Honolulu, HI 96813
(808) 586-4070
Bill.F.Cooper@Hawaii.gov

FOR THE STATE OF MAINE

AARON M. FREY
ATTORNEY GENERAL
*/s/ Laura E. Jensen*
Laura E. Jensen
Assistant Attorney General
Maine Attorney General's Office
6 State House Station
Augusta, ME 04333
(207) 626-8868

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
ATTORNEY GENERAL
*/s/ Roberta R. James*
Roberta R. James
Assistant Attorney General
Office of the Attorney General
Maryland Department of the Environment
1800 Washington Blvd.
Baltimore, MD  21230
(410) 537-3748

John B. Howard, Jr.
Joshua M. Segal
Steven J. Goldstein
Special Assistant Attorneys General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD  21202
(410) 576-6300

FOR THE STATE OF MINNESOTA

KEITH ELLISON
ATTORNEY GENERAL
*/s/ Peter N. Surdo*
Peter N. Surdo
Special Assistant Attorney General
445 Minnesota Street, Suite 900
St. Paul, MN 55101-2127
(651) 757-1061
peter.surdo@ag.state.mn.us

FOR THE STATE OF NEVADA

AARON D. FORD
ATTORNEY GENERAL OF NEVADA
*/s/ Heidi Parry Stern*
Heidi Parry Stern
Solicitor General
Daniel P. Nubel
Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson Street
Carson City, Nevada 89701
HStern@ag.nv.gov

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
ATTORNEY GENERAL
*/s/ Aaron A. Love*
Aaron A. Love
Chloe Gogo
Deputy Attorneys General
New Jersey Division of Law
25 Market Street
Trenton, NJ 08625
(609) 376-2762
aaron.love@law.njoag.gov

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
ATTORNEY GENERAL
*/s/ Anne E. Minard*
Anne E. Minard
Special Assistant Attorney General
State of New Mexico Office of the Attorney
General
Consumer & Environmental Protection
Division
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4045
aminard@nmag.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
ATTORNEY GENERAL
Yueh-Ru Chu
Chief, Affirmative Litigation Section
Environmental Protection Bureau
Austin Thompson
Assistant Attorney General
*/s/ Gavin G. McCabe*
Gavin G. McCabe
Assistant Attorney General
28 Liberty Street, 19th Floor
New York, New York 10005
(212) 416-8469
gavin.mccabe@ag.ny.gov

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
ATTORNEY GENERAL
Daniel S. Hirschman
Senior Deputy Attorney General
Francisco Benzoni
Special Deputy Attorney General
*/s/ Asher P. Spiller*
Asher P. Spiller
Taylor Crabtree
Assistant Attorneys General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6400

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL
*/s/ Paul Garrahan*
Paul Garrahan
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4593

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
ATTORNEY GENERAL
*/s/ Gregory S. Schultz*
Gregory S. Schultz
Special Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI  02903
(401) 274-4400
gschultz@riag.ri.gov

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL
*/s/ Nicholas F. Persampieri*
Nicholas F. Persampieri
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
nick.persampieri@vermont.gov

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
ATTORNEY GENERAL
*/s/ Emily C. Nelson*
Emily C. Nelson
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, Washington 98504
(360) 586-4607
emily.nelson@atg.wa.gov


FOR THE COMMONWEALTH OF
MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL
Christophe Courchesne
Assistant Attorney General
Chief, Environmental Protection Division
Matthew Ireland
Carol Iancu
Assistant Attorneys General
*/s/ Megan M. Herzog*
Megan M. Herzog
Special Assistant Attorney General
Office of the Attorney General
Environmental Protection Division
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 727-2200
megan.herzog@mass.gov

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
ATTORNEY GENERAL
*/s Jennifer L. Vandermeuse*
Jennifer L. Vandermeuse
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53702-7857
(608) 266-7714
vandermeusejl@doj.state.wi.us


FOR THE COMMONWEALTH OF
PENNSYLVANIA

JOSH SHAPIRO
ATTORNEY GENERAL
*/s/ Michael J. Fischer*
Michael J. Fischer
Chief Deputy Attorney General
Ann R. Johnston
Senior Deputy Attorney General
Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(215) 560-2171

49

FOR THE COMMONWEALTH OF
VIRGINIA

MARK R. HERRING
ATTORNEY GENERAL
Donald D. Anderson
Deputy Attorney General
Paul Kugelman, Jr.
Senior Assistant Attorney General
Chief, Environmental Section
*/s/ Caitlin C. G. O'Dwyer*
Caitlin C. G. O'Dwyer
Assistant Attorney General
Office of the Attorney General
Commonwealth of Virginia
202 North 9th Street
Richmond, Virginia 23219
(804) 786-1780
godwyer@oag.state.va.us

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
ATTORNEY GENERAL
*/s/ David S. Hoffmann*
David S. Hoffmann
Assistant Attorney General
Public Integrity Section
Office of the Attorney General
for the District of Columbia
441 Fourth Street N.W.
Suite 650 North
Washington, D.C. 20001
(202) 442-9889
david.hoffmann@dc.gov

FOR THE PEOPLE OF THE STATE OF
MICHIGAN

DANA NESSEL
ATTORNEY GENERAL
*/s/ Neil D. Gordon*
Neil D. Gordon
Gillian E. Wener
Assistant Attorneys General
Michigan Department of Attorney General
Environment, Natural Resources
and Agriculture Division
P.O. Box 30755
Lansing, MI  48909
(517) 335-7664
gordonn1@michigan.gov

FOR THE CITY OF LOS ANGELES

MICHAEL N. FEUER
CITY ATTORNEY
*/s/ Michael J. Bostrom*
Michael J. Bostrom (LCvR 83.2(c))
Assistant City Attorney
200 N. Spring Street, 14th Floor
Los Angeles, CA 90012
(213) 978-1882
*/s/ Matthew Sherb*
Matthew Sherb (D00276)
Deputy City Attorney
200 N. Main St., 7th Floor
Los Angeles, CA 90012
(213) 978-2204

FOR THE CITY OF NEW YORK
Georgia M. Pestana
Acting Corporation Counsel
Hilary Meltzer
Chief, Environmental Law Division
Kathleen C. Schmid,
Senior Counsel, Environmental Law Division
*/s/ Robert L. Martin*
Robert L. Martin (pro hac vice application to
be submitted)
Assistant Corporation Counsel,
Environmental Law Division
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-2070